UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

ANDREW MILLBROOKE, an individual,

                Plaintiff,

     v.

CITY OF CANBY; OFFICER JAMES MURPHY,
personally; CHIEF BRET SMITH, individually
and in his official capacity;

                Defendant.

Case No.: 3:12-cv-00168-AC

FINDING AND
RECOMMENDATIONS

---

ACOSTA, Magistrate Judge:

### Introduction

Plaintiff Andrew Millbrooke ("Millbrooke") brings this action against the City of Canby

(the "City"), Canby Police Officer James Murphy ("Officer Murphy"), and Canby Police Chief

Bret Smith ("Chief Smith") (collectively, the "Defendants") alleging:  (1) excessive force in

violation of the Fourth Amendment; (2) wrongful arrest in violation of the Fourth Amendment;

(3) a *Monell* violation of the Fourth Amendment; (4) negligent hiring, training, and supervision; and (5) battery.

Currently before the court is Defendants' motion for partial summary judgment against Millbrooke's *Monell* and negligence claims, as well as Millbrooke's motion for summary judgment on his demand for punitive damages, the availability of a qualified immunity defense, and all five claims for relief.[1]   Because no triable issue of fact exists as to whether Canby and Chief Smith ratified Officer Murphy's allegedly unconstitutional conduct or negligently hired, trained, or supervised Officer Murphy, Defendants' motion for partial summary judgment should be granted.   Because there is no factual dispute that Officer Murphy is not entitled to qualified immunity, Millbrooke's motion for summary judgment should be granted on Officer Murphy's qualified immunity defense.   However, Millbrooke's motion for summary judgment as to all other claims should be denied because disputed issues of material fact remain.

## Background

The following facts are not in dispute.  On October 13, 2010, Millbrooke was walking in the parking lot of Rounder's Pub, west of the Canby police station, when he noticed Officer Murphy across the street walking from his personal vehicle to his patrol car.  (Millbrooke Dep. 38:5-38:16, 40:1-40-2; Murphy Decl. Ex. 1, at 1).  Millbrooke recognized Officer Murphy as the officer who had pulled him over on May 28, 2010, and cited him for possession of less than an ounce of marijuana, driving on the wrong side of the road, and making an illegal U-turn. (Millbrooke Dep. 20:11-20:25, 21:1-21:14).

Both men observed the other looking in his direction.  (Millbrooke Dep. 39:5; Murphy Decl. Ex. 1, at 1).  Millbrooke had intended to reenter the pub, where he had consumed six pints

---

[1]  Millbrooke titled his motion as one for "partial summary judgment." However, the supporting memorandum seeks summary judgment as to all claims.

of beer in the preceding four and a half hours, but he grew uncomfortable after seeing Officer Murphy and decided to remain outside to "see what Officer Murphy was going to do." (Millbrooke Dep. 29:16-29:21, 39:5-39:23). Likewise, Officer Murphy watched Millbrooke for several minutes and eventually drove away in his patrol car at a slow speed "to see what the subject would do." (Millbrooke Dep. 42:2-42:4; Murphy Decl. Ex. 1, at 1). As he passed, Millbrooke raised his arms in the air to gesture "What's going on here? What are you doing? Is there a problem here?" (Millbrooke Dep. 43:3-43:7). The parties dispute whether Millbrooke jogged alongside Officer Murphy's car. (Murphy Decl. Ex. 1, 2; Millbrooke Dep. 88:8-88:10).

After Officer Murphy rounded a corner, Millbrooke walked over to Officer Murphy's personal truck and took three pictures of his license plate with his cell phone camera. (Millbrooke Dep. 45:11-45:13, 49:6-49:21). The parties dispute whether Millbrooke touched the vehicle. (Millbrooke Dep. 51:16-51:21; Murphy Decl. Ex. 1, at 2). Millbrooke explained, in his deposition and to police at the scene, that he took the pictures with the intention of investigating and exposing Officer Murphy's corruption and steroid use. (Millbrooke Dep. 48:1-48:4). Millbrooke intended to compare Officer Murphy's plates to those documented by a neighborhood investigation of cars parked outside of a suspected steroid dealer's home. (Millbrooke Dep. 44:1-44:6, 53:2-53:25).

Officer Murphy returned to the lot after circling the block to find Millbrooke near Officer Murphy's personal vehicle. (Millbrooke Dep. 91:1-91:10). Officer Murphy exited his patrol car and approached Millbrooke, asking what he was doing. (Millbrooke Dep. 94:8-94:14). Millbrooke answered "I'm taking pictures" and returned his cell phone to his pocket. (Millbrooke Dep. 94:13-94:22). Officer Murphy instructed Millbrooke to turn around and put his hands behind his back. (Millbrooke Dep. 96:2-96:3). Virtually all that ensued is in dispute.

PAGE 3: FINDINGS AND RECOMMENDATIONS                                        {KAR}

According to Millbrooke, he complied with Officer Murphy's instructions. Officer Murphy approached him from behind and immediately handcuffed him. (Millbrooke Dep. 64:4-64:19). Millbrooke told Officer Murphy that he felt he was being harassed. (Millbrooke Dep. 65:10). Officer Murphy asked Millbrooke if he had been drinking and Millbrooke answered affirmatively. (Millbrooke Dep. 65:11-65:12). Then, Officer Murphy thrust his knees into the backs of Millbrooke's knees and took him to the ground. (Millbrooke Dep. 65:13-65:15). Millbrooke began to shout for help and Officer Murphy screamed "shut up" into Millbrooke's ear repeatedly. (Millbrooke Dep. 65:21-65:22). Officer Murphy wrenched Millbrooke's cuffed arms into the air and jumped with both knees onto the center of Millbrooke's back. (Millbrooke Dep. 65:21-65:24). Officer Murphy remained on top of Millbrooke with his elbow pushed into the back of Millbrooke's head as he secured a second set of handcuffs on his wrists. (Millbrooke Dep. 66:7-66:24). Next, Officer Murphy yanked Millbrooke to his feet and led him stumbling backwards across the street to his patrol car. (Millbrooke Dep. 72:11-72-20).

Officer Murphy states that he saw Millbrooke circling his vehicle, looking through the windows, and attempting to open the door. (Murphy Decl. Ex. 1, at 2). According to Officer Murphy, Millbrooke was walking toward him when he told him to turn around and place his hands behind his back. (Murphy Decl. Ex. 1, at 2). Millbrooke staggered as he turned. (Murphy Decl. Ex. 1, at 2). Officer Murphy patted Millbrooke down based on suspicion that Millbrooke had returned a weapon to his baggy cargo shorts pocket. (Murphy Decl. Ex. 1, at 2). He smelled the strong odor of alcohol as he did so. (Murphy Decl. Ex. 1, at 2). During the pat down, Millbrooke turned around four times, against instruction, swinging his elbows toward Officer Murphy's face. (Murphy Decl. Ex. 1, at 2). On the fourth occurrence, Officer Murphy controlled Millbrooke to the ground by applying pressure to his shoulder. (Murphy Decl. Ex. 1,

PAGE 4: FINDINGS AND RECOMMENDATIONS                    {KAR}

at 2). Millbrooke rotated as an experienced fighter would do and refused to comply with Officer Murphy's instruction to lie flat on his stomach. (Murphy Decl. Ex. 1, at 2). Officer Murphy rolled Millbrooke over and forced his hands behind his back into handcuffs. (Murphy Decl. Ex. 1, at 2-3). Officer Murphy stood Millbrooke up, checked the tightness of his handcuffs, and double locked them. (Murphy Decl. Ex. 1, at 3). He instructed Millbrooke that he was under arrest for interfering with a peace officer. (Murphy Decl. Ex. 1, at 3).

The subsequent events are not in dispute. Other officers began to arrive and Millbrooke told them that he had just been assaulted and wanted to press charges against Officer Murphy. (Millbrooke Dep. 111:4-111:9). Millbrooke told Officer Murphy that he knew who he was. (Millbrooke Dep. 102:21-102:25). The officers searched Millbrooke and placed him in the back of Officer Murphy's patrol car. (Millbrooke Dep. 102:11-102:14). The officers transported Millbrooke to the Clackamas County Jail. There, he consented to a breath test and blew a 0.12. (Murphy Decl. Ex. 1, at 3).

On January 13, 2011, Millbrooke filed a complaint with the Canby Police Department alleging that Officer Murphy had used excessive force and wrongfully arrested him. (Smith Decl. Ex. 1, at 2). Chief Smith investigated each allegation in the complaint. (Smith Decl. ¶ 5). Pursuant to the investigation, Chief Smith interviewed a Rounders Pub bartender, Officer Murphy, and the officers who arrived at the scene. (Smith Decl. ¶ 5; Smith Decl. Ex. 1, at 6-7). Millbrooke declined Chief Smith's request for an interview. (Smith Decl. Ex. 3, at 2). Based on available evidence and the testimony of those interviewed, Chief Smith concluded that Officer Murphy did not use excessive force or wrongfully arrest Millbrooke. (Smith Decl. ¶ 6).

*Standard*

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2013). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). When parties submit cross-motions for summary judgment, the court must consider the merits of each motion on an "individual and separate basis, determining for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party fulfills that burden, the nonmoving party must go beyond the pleadings to identify facts that show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Szajer v. City of Los Angeles*, 632 F.3d 607, 610 (9th Cir. 2011). All reasonable doubt as to the existence of a genuine dispute of material fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638

F.2d 136, 140 (9th Cir. 1981). However, facts must be "viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## Discussion

### I.    Excessive Force

Millbrooke moves for summary judgment on his claim that Officer Murphy used excessive force against him in violation of his Fourth Amendment right to be secure against unreasonable seizures. U.S. CONST. amend. IV. The Fourth Amendment is enforceable against local law enforcement through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 650 (1961). Courts analyze excessive force claims under the Fourth Amendment's objective reasonableness standard, carefully balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotations omitted). The Ninth Circuit breaks this fact-intensive analysis into three distinct steps. *Espinosa v. City and Cty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). First, courts assess the severity of the intrusion by evaluating the kind and amount of force used. *Id.* Next, courts measure the government's interest by considering factors including the severity of the crime at issue, whether the individual posed an immediate threat, and whether the individual was resisting arrest or attempting to flee. *Id.*; *Graham*, 490 U.S. at 396. Finally, courts balance the gravity of the intrusion against the government's justification for use of such force to determine whether it was reasonable under the circumstances. *Espinosa*, 598 F.3d at 537.

Reasonableness is judged from the perspective of a hypothetical reasonable officer at the scene. *Graham*, 490 U.S. at 396. Hindsight and the actual officer's motive are not considered. *Id.* at 396-97.

Summary judgment is rarely granted for excessive force claims given their fact-specific nature. Whether a police officer was reasonable in applying force during an arrest is typically a question best answered by the jury. *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) ("Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."). "This is because [excessive force] cases almost always turn on a jury's credibility determinations." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

This case is no different. Neither side of the scale is fully developed: the parties disagree about the degree to which Officer Murphy intruded on Millbrooke's liberty and whether any force was reasonable necessary. The court is not equipped to balance these two undefined factors. A jury must address Millbrooke's excessive force claim. Accordingly, summary judgment should not be granted.

II.    Wrongful Arrest

Millbrooke moves for summary judgment on his claim that Officer Murphy wrongfully arrested him in violation of his Fourth Amendment rights. A police officer lawfully arrests an individual when he has probable cause to do so. *Henderson v. City of Seattle*, 71 F. Appx 631, 632 (9th Cir. 2003). Probable cause exists if, "under the totality of the circumstances known to the arresting officers (or within the knowledge of other officers at the scene), a prudent person would believe the suspect had committed a crime." *Dubner v. City and Cty. of San Francisco*,

266 F.3d 959, 966 (9th Cir. 2001). Accordingly, Officer Murphy's liability turns on whether a reasonable officer in his position would have thought Millbrooke was engaged in criminal activity or was about to commit a crime. *Graham*, 490 U.S. at 397.

Defendants argue Officer Murphy had probable cause to arrest Millbrooke for violating OR. REV. STAT. § 162.247, Interfering with a Peace Officer, which provides, in pertinent part:

> (1) A person commits the crime of interfering with a peace officer or parole and probation officer if the person, knowing that another person is a peace officer or a parole and probation officer as defined in ORS 181.610: (a) Intentionally acts in a manner that prevents, or attempts to prevent, a peace officer or parole and probation officer from performing the lawful duties of the officer with regards to another person; or (b) Refuses to obey a lawful order by the peace officer or parole and probation officer.

Whether a reasonable person in Officer Murphy's position would have thought Millbrooke refused to obey Murphy's lawful orders turns on the factual circumstances of the arrest, and here Officer Murphy and Millbrooke present conflicting accounts of the events leading up to Millbrooke's arrest. Both parties acknowledge that Millbrooke knew Murphy was a police officer, but the agreement ends there. Millbrooke contends that he obeyed all of Officer Murphy's orders and that Officer Murphy unlawfully harassed him. Officer Murphy states that, while he was lawfully frisking Millbrooke for weapons, Millbrooke repeatedly swung his elbow toward Officer Murphy's face in violation of Officer Murphy's express orders to stop. In addition, the parties contest whether Officer Murphy had reason to believe Millbrooke was engaged in criminal conduct in the parking lot, whether Officer Murphy had reasonable suspicion to stop Millbrooke in the first place, whether Officer Murphy had reason to suspect Millbrooke was armed, and whether Officer Murphy lawfully patted Millbrooke down.[2] The

---

[2] Millbrooke states that Officer Murphy should be held liable for an "unconstitutional pat-down or frisk." (Pl.'s Mem. in Supp. of Mot. for Summ. J. 15). However, Millbrooke did not assert

court cannot as a matter of law determine whether Officer Murphy lawfully arrested Millbrooke based on this disputed record. *Dirks v. Martinez*, 414 Fed.Appx. 961, 962 (9th Cir. 2011) ("The outcome of that [wrongful arrest] claim will depend upon a jury unraveling current 'unresolved credibility determinations.'"). Numerous unresolved factual questions preclude summary judgment on this issue, and Millbrooke's motion should be denied.

III.    *Monell* Violation

Both parties moved for summary judgment on Millbrooke's *Monell* claim. In *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978), the United States Supreme Court held that municipalities are considered "persons" under 42 U.S.C. § 1983[3] and thus can be held liable for civil rights violations where, "under color of some official policy, [the local governmental entity] 'causes' an employee to violate another's constitutional rights." Under this "official policy" requirement, a municipality may be held liable for an employee's injurious action only if the municipality is directly responsible for the violation. *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002). Traditional *respondeat superior* liability — that is, liability stemming strictly from the employee-employer relationship — does not apply. *Monell*, 436 U.S. at 691.

In order to hold the City liable for Officer Murphy's conduct, Millbrooke must show that (1) Officer Murphy infringed on his constitutional rights, (2) the City had a policy; (3) the City's policy amounted to "deliberate indifference" to Millbrooke's constitutional rights, and (4) the

---

such a claim in his complaint, nor did he allege that Officer Murphy patted him down in his description of the facts. Accordingly, the court need not address this argument.

[3] Section 1 of the Civil Rights Act of 1871, codified at 42 U.S.C. § 1983, provides broad relief against "[e]very person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

policy was the "moving force" behind the constitutional violation. *Oviatt By and Through Waugh v. Pearce,* 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton v. Harris,* 489 U.S. 378, 389-91 (1989)).  To satisfy the "policy" element, Millbrooke must demonstrate that: (1) the injurious act was the result of a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) the bad actor was an official "whose edicts or acts may fairly be said to represent official policy;" or (3) "an official with final policy-making authority either delegated that authority to, or ratified the decision of, a subordinate." *Ulrich,* 308 F.3d at 984–85.

Millbrooke's claim relies on the third ratification theory of municipal liability.  He alleges "Officer Murphy, acting under the color of law, deprived plaintiff of his Fourth Amendment rights" and "Brett [sic] Smith, acting a [sic] chief of police was the final policymaker for the City of Canby as to police conduct and he knowingly ratified and approved of Murphy's wrongful arrest and excessive force use, in writing a letter to plaintiff."  (Pl.'s Compl. ¶¶ 24, 25).  In support of his contention, Millbrooke submits two memoranda from Chief Smith detailing Chief Smith's investigation into Millbrooke's complaints and conclusions therefrom.

The ratification theory requires more than a supervisor's subsequent endorsement of a subordinate's discretionary act.  Otherwise, the ratification theory would "simply smuggle *respondeat superior* liability into section 1983 law." *Gillette v. Delmore,* 979 F.2d 1342, 1348 (9th Cir. 1992).  In addition to approving the subordinate's decision, the supervisor must deliberately endorse the unconstitutional *basis* for the subordinate's decision.  *Id.*  "The policymaker must have knowledge of the constitutional violation and actually approve of it.  A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983

claim." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004).  The supervisor must demonstrate "deliberate indifference:" "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997).

Millbrooke does not present sufficient evidence to satisfy this high burden.  From the evidence available, it appears that, rather than acting with deliberate indifference to Millbrooke's allegations, Chief Smith investigated each claim and interviewed multiple sources to determine the events of Millbrooke's arrest.  Chief Smith's final decision necessarily relied heavily on Officer Murphy's rendition of the facts because Millbrooke declined Chief Smith's request for an interview.  Similarly, in *Martiszus v. Washinton Cnty.*, 325 F. Supp. 2d 1160, 1166 (D. Or. 2004), a plaintiff pointed to the defendant county's internal report, which documented its investigation of the plaintiff's excessive force complaint and ultimately exonerated the police officer from the allegations, as evidence of the county's ratification of the police officer's allegedly unconstitutional conduct.  The county report relied exclusively on the police officer's version of the facts, which stood in stark contrast to the plaintiff's allegations.  *Id.*  In so relying, the county affirmed the officer's purported proper basis for his actions, not the improper basis alleged by the plaintiff.  *Id.*  Accordingly, the court rejected the plaintiff's *Monell* ratification claim, finding the county had not ratified any unconstitutional action.  *Id.*

Like the county in *Martiszus*, Chief Smith simply found "no indication of misconduct" or improper motive from the information available to him.  (Smith Decl. Ex. 3, at 4).  Even if Millbrooke was able to prove Officer Murphy infringed on his constitutional rights, Millbrooke cannot show that the City ratified such behavior in its investigation of the matter.  Accordingly,

as to Millbrooke's *Monell* claim, the defendant's motion for summary judgment should be granted and Millbrooke's motion should be denied.

IV.   Negligence

Both parties move for summary judgment on Millbrooke's claim against Defendants for negligent hiring, training, and supervision.[4]  They argue that the following requisite elements of negligence undisputedly tilt in their respective favors:

> (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

*Solberg v. Johnson*, 306 Or. 484, 490-91 (1988).

A. *Negligent Hiring and Supervision*

Claims of negligent hiring and negligent supervision turn on the same element: foreseeability.  In order to establish a negligent supervision claim under Oregon law, Millbrooke must demonstrate that the City had reason to know of Officer Murphy's alleged unlawful propensities.  *See Whelan v. Albertson's, Inc.*, 129 Or. App. 501, 507 (1994) (dismissing plaintiff's negligent supervision claim for failure to plead that the defendant knew or should have known of employee's discriminatory acts); *Washa v. Oregon Dept. of Corrections*, 159 Or. App. 207, 225 (1999), *aff'd*, 335 Or. 403 (2003) ("[O]ur general foreseeability analysis in a negligent supervision claim properly turns on whether — in light of the third party's criminal history — the defendant could reasonably foresee that the third party, if inadequately supervised, would engage in the kind of criminal conduct that ultimately harmed the plaintiff.").  Similarly, the

---

[4] Both parties' filings reference negligent retention. However, the court need not consider this claim because it was not raised in Millbrooke's complaint.

viability of Millbrooke's negligent hiring claim hinges on whether it was foreseeable, at the time of hiring, that Officer Murphy might injure others while carrying out his professional duties. *See Shoemaker v. Management Recruiters Int'l, Inc.*, 125 Or. App. 568, 575 (1993) (affirming dismissal of plaintiff's negligent hiring claim for failure to allege facts suggesting the employer had reason to know at the time of hiring that employee would engage in abusive conduct at work); *Chesterman v. Barmon*, 82 Or. App. 1, 4 (1986) ("The duty to use reasonable care in hiring . . . employees arises because it is foreseeable that that the employee, in carrying out his employment, may pose an unreasonable risk of injury to others.").

Generally, foreseeability is a question of fact and thus "is not a likely candidate for summary judgment." *Cunningham v. Happy Palace, Inc.*, 157 Or. App. 334, 337 (1998). However, the Oregon Supreme Court has recognized an exception to this general rule when a claimant fails to present any probative evidence of foreseeability. *Buchler v. State By and Through Oregon Corr. Div.*, 316 Or. 499, 511 (1993) (affirming summary judgment on negligence claim in favor of state because claimant did not present evidence that state reasonably should have known prisoner would escape and shoot victims). Millbrooke's negligent hiring and supervision claims falls into this exception.

Millbrooke argues that summary judgment against the City is warranted given the court's ruling in *Bonneau v. Murphy*, No. 03-11-CV-00745-HU, 2013 WL 1386617 (D. Or. Apr. 4, 2013). *Bonneau* involved a routine traffic stop conducted by Officer Murphy on June 27, 2009. (Berman Decl. Ex. 3, 1). The court granted summary judgment to the plaintiff on the limited issue of whether Officer Murphy had reasonable suspicion to justify a pat-down. *Bonneau*, 2013 WL 1386617, at *2. Millbrooke asserts that this holding put the City on notice of Officer Murphy's "legal and professional deficiencies." (Pl.'s Mem. in Supp. of Mot. for Partial Summ.

J. 21).  However, foreseeability relates to foresight, not hindsight.  The court did not issue the
*Bonneau* opinion until April 2013, almost three years after the evening at issue here.  Logically,
the *Bonneau* opinion could not possibly have put the City on notice that something which
occurred years before was foreseeable.  Millbrooke has not provided any further evidence to
show that Bonneau, or any other citizen, submitted complaints against Officer Murphy to the
City before Millbrooke's arrest.  Nor has Millbrooke presented any other evidence suggesting the
City reasonably should have foreseen, at the time of hiring or during employment, that Officer
Murphy might engage in the violent, unlawful behavior alleged by Millbrooke.  Accordingly,
Millbrooke's motion for summary judgment on his claims for negligent hiring and supervision
should be denied.  Furthermore, given Millbrooke's failure to make a sufficient showing of any
genuine issue of material fact, Defendants' motion for summary judgment on Millbrooke's
negligent hiring and supervision claims should be granted.  *Aranda v. City of McMinnville*, No.
03-12-CV-00170-SI, 2013 WL 1793942, at *9 (D. Or. Apr. 29, 2013) (citing *Celotex*, 477 U.S.
at 322-23) (granting summary judgment to county based on plaintiff's failure to carry burden in
response to motion).

    *B.  Negligent Training*

       In order to prevail on a negligent training claim, Millbrooke must show that the City's
alleged failure to train employees regarding "dealing with citizens safely" and the "safe restraint
of civilians" was a substantial contributing factor to Millbrooke's injuries.  *Woodbury v. CH2M
Hill, Inc.*, 335 Or. 154, 163 (2003); (Compl. ¶ 27).  There is no evidence in the record to indicate
that the City's training was insufficient or that the City's training programs in any way
contributed to Millbrooke's alleged injuries.  Just the opposite, the City submits evidence
suggesting that Officer Murphy was a well-trained police officer.  He received over 700 hours of

PAGE 15: FINDINGS AND RECOMMENDATIONS          {KAR}

training before being certified as a police officer. (Smith Decl. ¶ 3). He took eighty hours of training in defensive tactics to become a certified instructor. (Smith Decl. ¶ 6). In response to this showing, Millbrooke asserts that, regardless, the City should have provided Murphy with additional training after he improperly frisked Bonneau in 2009. However, as discussed above, Millbrooke offers no evidence to indicate the City was aware that Officer Murphy's frisk of Bonneau was improper until 2013, well after Millbrooke's arrest. There is no evidence that the City had any notice that further training might be warranted. The City provided probative evidence to contradict Millbrooke's negligent training claim and Millbrooke failed to present any evidence suggesting a reasonable jury could still find for him in light of that evidence. Accordingly, Millbrooke's motion for summary judgment on this issue should be denied and Defendants' motion should be granted.

## V.    Battery

Millbrooke contends he is entitled to summary judgment on all five of his claims. However, he does not offer any evidence or legal analysis to establish the absence of a legitimate dispute regarding whether Officer Murphy committed battery against him. Just the opposite, the parties present conflicting accounts of their physical altercation that foreclose summary judgment on Millbrooke's battery claim. Two key questions remain: whether Officer Murphy intended to injure Millbrooke and whether Officer Murphy's actions were justified.

Oregon case law defines battery as "unpermitted physical contact" made with the intent to injure, insult, or offend. *Cook v. Kinzua Pine Mills Co.*, 207 Or. 34, 48 (1956); *Bakker v. Baza'r, Inc.*, 275 Or. 245, 249 (1976). The parties debate whether Officer Murphy intended to harm Millbrooke when he used physical force to arrest him. Thus a key element of the tort is in dispute. Furthermore, the parties dispute whether Officer Murphy's actions were justified.

Where a police officer uses force reasonably necessary under the circumstance to fulfill his lawful professional duties, he is deemed justified in his actions and thus not liable for a resulting battery claim. *Gigler v. City of Klamath Falls*, 21 Or. App. 753, 763 (1975); OR. REV. STAT. § 161.235. Here, the parties disagree whether Officer Murphy had reason to use *any* force against Millbrooke. Summary judgment is not appropriate given these persisting questions.

VI.    Punitive Damages

Millbrooke asserts his punitive damages claim against Officer Murphy must "prevail as a matter of law." (Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. 15). Punitive damages "operate as 'private fines' intended to punish the defendant and to deter future wrongdoing." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001). As a condition precedent to a punitive damages award, the court must find the defendant acted with "evil intent or motive" or "reckless or callous indifference" to others' federally-protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983). This inquiry hinges on factual findings best suited for a jury. *Cooper Indus., Inc.*, 532 U.S. at 446 (Ginsburg, R., dissenting) ("[T]here can be no question that a jury's verdict on punitive damages is fundamentally dependent on determinations we characterize as factfindings — *e.g.,* the extent of harm or potential harm caused by the defendant's misconduct, whether the defendant acted in good faith, whether the misconduct was an individual instance or part of a broader pattern, whether the defendant behaved negligently, recklessly, or maliciously."). Because Officer Murphy's actions and intent are still in dispute, Millbrooke's motion for a decision on punitive damages is premature. Accordingly, his motion should be denied.

VII.    Qualified Immunity

Millbrooke seeks summary judgment on whether Officer Murphy is entitled to qualified immunity.  Officer Murphy asserts qualified immunity as an affirmative defense but he has not responded to Millbrooke's motion on this issue.

Qualified immunity insulates government officials, such as police officers, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Maxwell v. County of San Diego*, 697 F.3d 941, 947 (9th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To determine whether qualified immunity protects an officer, the court must make a two-pronged inquiry into:  (1) whether the alleged facts constitute a violation of a right; and (2) whether the right at issue was "clearly established" at the time of the alleged violation.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  Courts have discretion as to which prong to consider first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A right is "clearly established" if a reasonable official would understand his alleged actions to violate that right.  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  As detailed in the sections above, all constitutional rights at issue here are clearly established.  *Ashcroft v. al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2083 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").  A reasonable officer should know that the Fourth Amendment prohibits him from taking a civilian violently to the ground without provocation and arresting him without cause.  *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) ("The right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established."); *U.S. v. Sokolow*, 490 U.S. 1, 12 (1989) ("The Fourth Amendment cabins

government's authority to intrude on personal privacy and security by requiring that searches and seizures usually be supported by a showing of probable cause."). Accordingly, the only remaining inquiry is whether the facts alleged, if true, demonstrate that Officer Murphy violated these clearly established rights. Regardless of the answer, Officer Murphy is not entitled to qualified immunity. *See Bonneau v. Murphy*, No. 03:11-CV-00745-HU, 2013 WL 1386331, at *11 (D. Or. Feb. 5, 2013) (where the right at issue is clearly established, qualified immunity will not be applied because it is either not available or not necessary). If the finder of fact accepts Millbrooke's rendition of the facts — that Officer Murphy used excessive force when he unlawfully arrested him — then qualified immunity will not protect Officer Murphy from liability. If the finder of fact believes Officer Murphy's version of events — that he used the force reasonably necessary to lawfully arrest Millbrooke — then Officer Murphy will not be liable and the question of immunity will be moot. Given this indisputable outcome, and Officer Murphy's failure to offer any probative evidence to the contrary, the court should grant Millbrooke's motion for summary judgment on the issue of qualified immunity.

## Conclusion

For the reasons set forth above, Millbrooke's motion (#29) for summary judgment should be GRANTED as to qualified immunity and DENIED on all other grounds. Defendants' motion (#19) for summary judgment on Millbrooke's *Monell* and negligence claims should be GRANTED.

## Scheduling Order

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **December 31, 2013**. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 11th day of December 2013.

JOHN V. ACOSTA
United States Magistrate Judge